Belknap
No. 97-589

THE STATE OF NEW HAMPSHIRE

v.

WARREN GOODALE

October 20, 1999

*Philip T. McLaughlin*, attorney general (*Mark D. Attorri*, senior assistant attorney general, on the brief, and *Malinda R. Lawrence*, assistant attorney general, orally), for the State.

*Gary Apfel*, assistant appellate defender, of Orford, by brief and orally, for the defendant.

BROCK, C.J. The defendant, Warren Goodale, was convicted after a jury trial in Superior Court (*Perkins*, J.) of second degree assault. *See* RSA 631:2 (1996). We affirm.

Based upon the evidence at trial viewed most favorably to the State, *see State v. Smart,* 136 N.H. 639, 643, 622 A.2d 1197, 1200, *cert. denied,* 510 U.S. 917 (1993), the jury was entitled to find the following facts. In September 1996, after an evening of drinking, the defendant and his girlfriend returned to the girlfriend's apartment. The two had been arguing, and while walking toward the apartment, the defendant began to punch her and to pull her hair. Once inside the apartment, the defendant kicked her several times, causing a displaced fracture to her right femur. The defendant then sat down in the living room, drank a beer, and refused to call an ambulance.

The defendant was charged with first degree assault. *See* RSA 631:1 (1996). He took the position at trial that the victim had assaulted him, and in attempting to protect his groin from being kicked, he had raised his leg. As a result, the victim's femur struck his knee, causing the fracture. The jury acquitted the defendant of first degree assault, but convicted him of second degree assault.

On appeal, the defendant argues that the trial court erred by: (1) denying his motion to depose the State's expert witnesses; (2) allowing the State to obtain criminal records of potential jurors while denying him equal access to such records during jury selection; and (3) prohibiting him from cross-examining the victim about a prior false statement and from introducing extrinsic evidence of her untruthful conduct. We address each argument in turn.

## I. Motion to Depose the State's Expert Witnesses

Prior to trial, the State indicated that it intended to call three physicians and an emergency room nurse as witnesses. The defendant moved to depose those witnesses pursuant to RSA 517:13 (1997). Citing *State v. Rhoades,* 139 N.H. 432, 655 A.2d 414 (1995), the defendant asserted that he had shown necessity for depositions based on the facts and circumstances of his case. After a hearing, the Superior Court (*Smukler,* J.) denied the motion without prejudice because he had not attempted to attain the information through alternative methods. *See* RSA 517:13, II(b) (in determining necessity to depose State's non-expert witness, trial court considers other opportunities to discover information).

On appeal, the defendant argues that the witnesses he sought to depose were expert witnesses, and thus the trial court had no discretion to deny the motion. *See* RSA 517:13, III; *State v. Martin,* 142 N.H. 63, 64-65, 694 A.2d 999, 1000 (1997). The State argues that any error was invited. We agree.

■ Under the "invited error" doctrine, "[a] party may not avail himself of error into which he has led the trial court, intentionally or unintentionally." 5 C.J.S. *Appeal and Error* § 745, at 179 (1993); *see State v. LaPlante*, 117 N.H. 417, 418, 374 A.2d 643, 644-45 (1977). In this case, the defendant himself argued that he had shown necessity for the depositions, and cited a case in which we held that to depose the State's non-expert witnesses, "[t]he defendant must make some showing of necessity . . . with reference to the facts and circumstances of the particular case." *Rhoades*, 139 N.H. at 434, 655 A.2d at 415. The defendant never argued below that because the witnesses were experts, he was entitled as a matter of law to depose them. Accordingly, he cannot now claim the trial court erred by using the very standard he asked the court to apply. *See State v. Bey*, 709 N.E.2d 484, 492-93 (Ohio 1999); *cf. E. Udolf, Inc. v. Aetna Cas. and Sur.*, 573 A.2d 1211, 1216 (Conn. 1990).

## II. Access to Criminal Records of Potential Jurors

The defendant next argues that the trial court erred by allowing the State to use the criminal records of potential jurors during jury selection and denying him equal access to such records. In Belknap County, it is apparently the practice of the county attorney's office to obtain the criminal records of potential jurors in criminal cases. When a member of the venire is selected to be on a defendant's jury panel, the State compares the selected juror's questionnaire and criminal record history. If the selected juror omitted information about the juror's criminal record on the questionnaire, the State at that time informs the trial court and the defendant of the omission.

Prior to trial, the defendant objected to the State's use of criminal records in the jury selection process. The defendant asserted that he did not have access to such information, and thus the State was "in a position [to] engineer the jury pool to be more favorable to its interests." The defendant argued that his rights to fundamental fairness and to an impartial jury would be violated if the State were permitted "to draw a jury based on information . . . unavailable to [him]." The defendant moved that the trial court order the State either to certify that it had not used information other than juror questionnaires to assist it in jury selection, or not to use official information unavailable to the defendant during jury selection. Based upon the State's practice of disclosing information omitted from selected jurors' questionnaires, the Superior Court (*Smukler*, J.) denied the motion but directed the State to continue that practice.

On appeal, the defendant argues that this procedure violated his rights to an impartial jury and to due process under both the State and Federal Constitutions. Thus, he asserts that the trial court erred in allowing the State to obtain the criminal records for use in jury selection while not providing him equal access.

■ The State argues that the defendant failed to preserve these claims. Because the defendant only requested that the State be prohibited from *using* the criminal record histories during jury selection, the State argues that he cannot now contend that the trial court erred in allowing the State to obtain the records or in not providing him equal access to the records. We agree that the defendant never requested equal access to the records. As such, he cannot now argue that the trial court's failure to provide access constituted reversible error. *Cf. State v. Horne*, 136 N.H. 348, 349, 615 A.2d 1251, 1252 (1992).

With respect to the contention that the defendant failed to request that the State be precluded from obtaining the records, we note that the defendant argues not merely that the trial court erred in permitting the State to obtain the records, but in permitting the State to obtain the records *for use* during jury selection. The State concedes that the defendant requested that the State be precluded from using the records. Hence, the trial court's denial of such relief in effect permitted the State to obtain the records for use during jury selection. Moreover, the State does not argue that the constitutional grounds raised on appeal were not raised below. Accordingly, the trial court was given an opportunity to rule on its purported error to the extent that the defendant challenges the constitutionality of permitting the State to use criminal records during jury selection, *see State v. Tselios*, 134 N.H. 405, 407, 593 A.2d 243, 245 (1991), and to that extent we conclude that his arguments are preserved.

■ We analyze the arguments first under New Hampshire law, "referenc[ing] . . . decisions of the United States Supreme Court and other jurisdictions only for the purpose of aiding our State constitutional analysis." *State v. Cannuli*, 143 N.H. 149, 151, 722 A.2d 450, 451 (1998) (quotation omitted). Because we find the New Hampshire Constitution at least as protective of the defendant's rights in this case as the Federal Constitution, *see State v. Graf*, 143 N.H. 294, 296, 726 A.2d 1270, 1277 (1999) (due process); *State v. Rideout*, 143 N.H. 363, 365, 725 A.2d 8, 9 (1999) (impartial jury), we do not engage in a separate federal analysis, *see State v. Ball*, 124 N.H. 226, 232, 471 A.2d 347, 351 (1983).

With respect to the defendant's claim that the procedure denied him an impartial jury, we note that the defendant does not argue that his jury in fact lacked impartiality. Accordingly, "the right of trial by an impartial jury . . . is not directly implicated in this case." *State v. Castle*, 128 N.H. 649, 651, 517 A.2d 848, 849 (1986). Thus, "[o]ur inquiry focuses . . . on the procedural protections necessary to ensure the impartiality of jurors." *Id.*

Significantly, the defendant does not claim that the State withholds information revealed in the empaneled jurors' criminal records that the jurors omitted from their questionnaires. Rather, the defendant acknowledges that this information is disclosed both to the court and to counsel, either through the questionnaires or the State's disclosure, once the jurors are selected. Thus, the information is equally available to the parties for use in challenging the selected jurors, either peremptorily or for cause. The only prejudice that the defendant claims by virtue of the State's unequal access to the records is that with knowledge of the criminal records of the unselected members of the venire, the State is in a better position to know who might replace a selected juror in determining whether to exercise a peremptory challenge. While our constitutional policy requires that *voir dire* be conducted in a manner that permits reasonably intelligent use of peremptory challenges, *cf. State v. Brodowski*, 135 N.H. 197, 201, 600 A.2d 925, 927 (1991), we cannot hold that equal knowledge of the criminal records of unselected members of the venire is constitutionally required to ensure the ultimate impartiality of the defendant's jury, *cf. Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (so long as defendant's jury is ultimately impartial, that the defendant had to exercise a peremptory challenge to attain an impartial jury does not violate the right to an impartial jury under federal law).

Although the defendant's claim of prejudice did not constitute a violation of his right to an impartial jury, we conclude that it did constitute a violation of his right to due process. Principles of fundamental fairness guide our analysis of the defendant's due process claim. *See Graf*, 143 N.H. at 302, 726 A.2d at 1277. "A fundamentally unfair adjudicatory procedure is one, for example, that gives a party a significant advantage or places a party in a position of prejudice or allows a party to reap the benefit of his own behavior in placing his opponent at an unmerited and misleading disadvantage." *Id.* (quotation omitted).

In this case, both the State and the defendant agree that the defendant could not have acquired the criminal records under State

law. *See* RSA 106-B:14, I (Supp. 1998); N.H. ADMIN. RULES, Saf-P 403.04. Moreover, pursuant to the State's practice, discrepancies between the criminal records and the questionnaires of members of the venire are not disclosed to defendants unless the venire members are selected to be on the jury panel. Thus, to the extent that the members of the defendant's venire failed to disclose such information on their questionnaires, the trial court's order permitted the State access to information that was unavailable to the defendant. This procedure conferred on the State a significant advantage in determining whether to exercise its peremptory challenges.

We disagree that the defendant had no interest in knowing the criminal histories of the potential replacement jurors. "While a defendant may not have exactly the same motive for wanting access to this information, a defendant obviously seeks to obtain the same amount and type of information that the State possesses in exercising peremptory challenges." *State v. Bessenecker,* 404 N.W.2d 134, 138 (Iowa 1987).

■ We conclude that fundamental fairness requires that official information concerning prospective jurors utilized by the State in jury selection be reasonably available to the defendant. *See id.*; *Losavio v. Mayber*, 496 P.2d 1032, 1035 (Colo. 1972) (en banc); *cf. Commonwealth v. Smith*, 215 N.E.2d 897, 901 (Mass. 1966); *Tagala v. State*, 812 P.2d 604, 612 (Alaska Ct. App. 1991). Accordingly, the trial court erred in allowing the State to use criminal records of members of the venire during jury selection that were unavailable by law to the defendant.

We nonetheless affirm the defendant's conviction in this case, as he has failed to demonstrate that he was in fact prejudiced by the trial court's ruling. *Cf. Graf*, 143 N.H. at 303, 726 A.2d at 1277; *McIntire v. Woodall*, 140 N.H. 228, 230, 666 A.2d 934, 936 (1995) (to prevail on due process claim appealing party generally must demonstrate prejudice). None of the jurors who were called to serve on the defendant's jury failed to disclose their criminal histories on their questionnaires. The record is unclear as to whether the defendant exercised all of his peremptory challenges. Accordingly, he cannot demonstrate in this case that in fact the lack of information affected his decision whether to exercise his peremptory challenges.

■ Moreover, while the trial court's ruling permitted the State to use the criminal records of the members of the venire in determining whether to exercise its peremptory challenges, the

defendant has failed to preserve for the record whether the State used this information during jury selection. Indeed, the defendant states in his brief that the State compares the juror questionnaire and criminal record *after* the juror is selected. This would suggest that as to the members of the venire in this case, both the State and the defendant were in fact on equal footing. Accordingly, we conclude that the defendant has not shown that he was harmed by the trial court's ruling.

*III. Impeachment of the Victim*

Finally, the defendant argues that the trial court erred by prohibiting cross-examination of the victim about a prior false statement, and by prohibiting him from introducing extrinsic evidence of her untruthful conduct. In 1995, the victim filed a domestic violence petition in the Laconia District Court alleging that another man "broke my back, . . . broken [*sic*] nose, broken [*sic*] ribs." The district court dismissed the petition because the victim had "declined . . . to provide any specific evidence of abuse."

At trial, the defendant's counsel asked the victim whether she had disclosed to her doctors in this case major medical events that she had experienced. She responded that "[t]here was nothing to tell." The following exchange transpired.

Q. How about broken back?
A. Didn't have broken back.

> [THE STATE]: Object, Your Honor.
> [THE DEFENSE]: May we approach?
> THE COURT: Sure.
> [Whereupon, a Bench conference is held off the record.]

. . . .

Q. Now, you've said before that you've had a broken back; correct?
A. No, I have not.

> [THE STATE]: Objection.
> THE COURT: Sustained.

. . . .

Q. Have you ever filed papers with courts before?
A. Yeah.

. . . .

Q. Okay. And under what circumstances have you filed papers with courts before?

[THE STATE]: Objection again on relevancy.
THE COURT: Sustained.

Q. Did you ever tell a court before that you had a broken back?
A. No.

[THE STATE]: Object again. Foundation and relevancy.
THE COURT: Sustained.

The defendant's counsel then made an offer of proof, asserting that the domestic violence petition revealed that the victim in fact had alleged to a court that another person had broken her back, ribs, and nose, and that he needed to inquire into such matters solely to challenge the victim's credibility. The trial court sustained the State's objection, ruling that the defendant had failed to demonstrate relevance under New Hampshire Rule of Evidence 608(b).

On appeal, the defendant asserts that the victim lied either when she filed the domestic violence petition, or when she testified that she didn't have a broken back. The defendant further argues that she lied when she denied that she had ever told a court or anyone else that she had broken her back. Thus, the defendant contends that the proposed cross-examination was relevant as a matter of law under Rule 608. Furthermore, because the victim "perjured herself" in testifying that she never told a court that she had a broken back, the defendant argues that the trial court should have admitted the domestic violence petition as extrinsic evidence of her "perjury." *See State v. Vandebogart*, 139 N.H. 145, 167, 652 A.2d 671, 685 (1994). The State counters that even if the trial court erred, the error was harmless. We agree.

■ The State bears the burden to prove that an error was harmless. *See State v. Williams*, 142 N.H. 662, 667, 708 A.2d 55, 58 (1998). Error is not harmless "unless we can say beyond a reasonable doubt that the verdict was not affected by it." *State v. Dedrick*, 135 N.H. 502, 509, 607 A.2d 127, 131 (1992). "In deciding whether the State has met its burden, we consider the strength of the [State's] evidence presented at trial. We also consider the character of the [excluded] evidence, including whether the evidence was . . . inconsequential in relation to the State's evidence." *State v. Thibedau*, 142 N.H. 325, 329, 702 A.2d 299, 301 (1997) (citations omitted).

The evidence introduced by the State in this case was compelling. The orthopedic surgeon who performed surgery on the victim's leg testified that the victim's injury was "traumatic" — that "a certain amount of energy was delivered to the bone to break it," and that "to break a normal femur takes a lot of energy." He also testified that the leg had extensive bruising that in his opinion was from an assault, and that upon his initial examination of the victim she "looked like someone who had been assaulted." The bruising on the leg, according to the surgeon's testimony, indicated that there was likely more than one impact. In his opinion, the victim's injury was likely caused by "a blow such as a kick, . . . [or] by being tossed across the room and falling on it or multiple kicks." Her injury "was not caused by a little minor bump." "Femurs," according to the surgeon, "are broken when you hit concrete walls on motorcycles at 60 miles an hour or hit a tree when you're skiing." The emergency room physician who initially treated the victim also testified that "[t]he instance where we usually see this kind of severity is motor vehicle accidents."

Although the surgeon conceded that a femur may fracture without much force if it is weak, and that a femur may be weakened by medical conditions and diseases that he did not test for, he testified that most of those conditions are rare, that there were no indications that the victim's femur was abnormally weak, and that he was "100 percent sure" that the bone was not diseased. The radiologist who examined the victim's X rays also testified that there was nothing in the X rays indicating that the femur was diseased in a manner that might predispose it to being broken.

While the defendant's theory at trial was that the victim had broken her femur by striking his knee in an attempt to kick him, the arresting officer testified, and the defendant conceded, that his only explanation at the time of his arrest was that the victim "must have slipped and fallen and . . . if there's anything wrong with her leg she must be faking it." Moreover, although the defendant testified that the victim kicked him "[h]ard enough . . . to hurt," and that she connected with his knee several times, several other witnesses testified that he did not limp or indicate in any way that his leg was in pain shortly after the incident.

On several other occasions the defendant impeached the victim's credibility. He introduced testimony that the victim had a reputation for being dishonest. He cross-examined the victim vigorously about inconsistencies between her testimony and prior statements. Two witnesses testified for the defendant that the victim generally becomes irrational and unpredictable when, as in this case, she has

had several drinks, and that she had on a prior occasion assaulted the defendant. Finally, the defendant testified that the victim in the past had lied about being terminally ill to "get some attention."

 Although we acknowledge that this case essentially presented a credibility contest between the defendant and the victim, in view of the overwhelming nature of the State's evidence, we are convinced beyond a reasonable doubt that the additional impeachment value of the defendant's proposed inquiry into the 1995 domestic violence petition would not have affected the verdict.

*Affirmed.*

All concurred.