Hillsborough
No. 89-151

THE STATE OF NEW HAMPSHIRE

v.

WALTER GREEN

May 24, 1990

*John P. Arnold*, attorney general (*Andrew W. Serell*, senior assistant attorney general, on the brief, and *Barbara Keshen*, assistant attorney general, orally), for the State.

*W. Kirk Abbott, Jr.*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J. The defendant appeals the Superior Court's (*Pappagianis*, J.) denial of his motion to suppress certain evidence. The evidence was introduced at trial, and the jury convicted the defendant of two counts of first degree murder and one count each of theft and arson. The court sentenced the defendant to two terms of life imprisonment without parole on the murder charges and concurrent terms of three and one-half to seven years and seven and one-half to fifteen years on the theft and arson charges, respectively. For the reasons stated below, we affirm.

Shortly after 9:00 p.m. on New Year's Eve, 1987, John Scanlon noticed a fire at 37 Titus Avenue in Manchester, the home of Dorothy Richards. He ran to the house and discovered the still-warm body of a young girl, later identified as four-year-old Holly Richards, just inside the kitchen door. Scanlon rushed Holly to the neighborhood fire station, where firefighters made a futile attempt to revive her. Firefighters Stephen Brinn and Francis Monnelly testified at trial that a jump rope was found tied tightly around Holly's throat and that Holly's body lacked signs characteristic of death by smoke inhalation (*e.g.*, bluish skin, soot in mouth and nose). Monnelly explained,

"I felt at the time it was that they should tell the emergency room physician that this child came from a burning building but that it appeared, you know, the child may have died from something other than a fire; that she may have been strangled."

When the firefighters brought their equipment to Dorothy Richards's burning home, they discovered the badly burned body of another girl, nine-year-old Kelly Richards. A red cord or ribbon was found wrapped around her neck, and the carpet was clean and undamaged beneath her body, although it was charred and destroyed elsewhere throughout the room.

Detective Paul Beaudoin arrived at the house shortly after the firefighters. He noticed that all four tires of Dorothy Richards's car, parked in her driveway, were flattened. When Richards arrived at the scene, she told him that the tires had not been flat when she left her home earlier that evening, and therefore Beaudoin had the car towed to the police station for inspection.

Captain Paul Brodeur, Lt. Calvin Colby, and Associate Attorney General Brian Tucker also investigated the scene that evening. At about 11:30 p.m., Walter Green drove his truck up to one of the police barricades set up near Richards's house and stopped. He got out of the truck and approached the house, leaving the motor running, the lights on, and his door ajar. Although the road was clear of snow, he ran along the sidewalk through a snow bank. The officers testified that he "was excited, looked like he was in a hurry." At that time, Colby knew that a Walter Green was wanted for questioning, but he did not know Green or how he was connected to the fire. Moreover, while Colby knew that the two Richards girls were dead and suspected a crime had been committed, he did not know the cause of their deaths. He had not yet been informed that Dorothy Richards's tires had been flattened.

Several officers approached Green, and while some asked him questions, Colby frisked him. Colby removed and retained a Craftsman 3/16 inch screwdriver from one of Green's pockets. Both Colby and Brodeur noticed that Green appeared intoxicated. The testimony was that his eyes were "glassy," "bloodshot," and "droopy," his speech was slurred, and his breath smelled of alcohol.

Colby then asked Green for permission to move his truck, because it blocked the way of a police cruiser. Green consented. When Colby reached the truck, he noticed a beer can on the ground by the driver's door and a cigarette burning a hole in a blanket on the front

seat. Meanwhile, Tucker advised Brodeur to let Green move the truck himself "so that we would not put ourselves in a position of exposing ourselves to anything that we should not be exposed to at that time." Brodeur asked Green to move the truck to the other side of the road, but instead Green drove it in reverse for one and one-half blocks, before crashing into a police cruiser. Colby testified that Green's truck moved at a speed of over twenty miles per hour and was accelerating until stopped by the police cruiser. Based upon this evidence of impaired driving and intoxication, Brodeur ordered Green taken into protective custody. Brodeur then entered Green's truck in order to disengage it from the police cruiser, and noticed a gallon jug labelled "Zerex" antifreeze.

Once Green was placed in protective custody, police officers conducted a standard inventory search and removed Green's jacket, wallet, keys, and shoes. Brodeur left instructions to be told when Green's protective custody was at an end, so that he could question Green.

The following morning, January 1, 1988, Green was given a breathalyzer test in order to determine his suitability for interviewing. After the test showed a blood alcohol content of .00%, an officer escorted Green to an interview room, where Brodeur and Sergeant Wayne Richards questioned him. Neither officer was in uniform, but Brodeur testified that each probably wore his service revolver.

Before the interview began, Richards and Brodeur told Green he was no longer in custody. Brodeur testified as follows:

"Q. Okay. Did you have some initial discussions with Walter Green before the interview even started?

A. Basically the fact that he was their [sic] voluntarily, that he was free to leave at any time if that's what you mean and/or he was advised of what's known as the Miranda Rights.

Q. What did you tell him about the fact he could leave at any time?

A. Well, basically the fact that being in under protective custody, as far as breathalyzer is concerned, he was now sober. He was, had the ability to, even if he wished he could leave at any time and he'd so be released."

Richards testified:

"Q. And how did the interview begin?

A. The interview began customarily with both the captain and myself interviewing—stating who we were and telling him that at that particular time we had no charges against him. He was not being held for any crime, and that he was free to go; that we would like to ask him some questions relating to the previous evening if he, if he would.

Q. So you told him he wasn't currently being held at that time, is that right?

A. Yes, that's correct."

Green indicated he was willing to answer the officers' questions, and Brodeur, being "super-cautious," gave Green *Miranda* warnings. Brodeur testified:

"We are aware that if someone is not in custody you don't have to but because of the issue we were talking about and the fact that the person is in a police station, I guess the inference has been drawn that it, whether they're in custody or not, it's better that you give them Miranda rights than not."

Green read the *Miranda* rights out loud, told Brodeur and Richards he understood them, and signed the *Miranda* waiver form.

Green then told the officers that he had had an intermittent relationship with Dorothy Richards for the past one and one-half years. He thought he had a date with her for New Year's Eve, but since he could not locate her, he instead went to the British American Club in Manchester. He said he stayed at the club from 6:30 p.m. to 10:30 p.m. and drank about four alcoholic drinks per hour. The officers asked Green few questions and let him describe his evening in a narrative style. The officers testified that the tone of the interview was inquisitive, relaxed, and non-accusatory. Moreover, Green appeared to the officers alert, coherent, truthful, cooperative, and relaxed, and they testified that the details of his story were verifiable and exculpatory.

Brodeur next asked Green for permission to search his truck. To the officers' surprise, Green refused. They asked if he understood the scope of their investigation, and he replied that he assumed they were investigating a fire. The officers then told Green that the Richards girls had died and that the police were looking into a possible double homicide and arson case. Since Green responded by crying audibly, the officers assumed he was surprised by the news.

Brodeur and Richards explained to Green that they were only interested in evidence relating to the possible homicides and arson. In particular, they wished to rule out the possibility that the gallon jug labelled "Zerex" contained a flammable liquid. They promised Green that nothing found in the truck would be used against him in connection with another crime. Green then told the officers that they would find some items in the truck, including a driver's license, that belonged to Dorothy Richards. He said he took them from her home several days before. Brodeur and Richards told Green they were not interested in these items, so long as they were unconnected to the fire and the death of the Richards girls. Green replied that the items were not in any way connected. He then signed his name to a consent form. Altogether, Green refused consent to the search possibly three times before he signed the consent form. The officers, however, never raised their voices during the interview, threatened him, or told him they could easily obtain a warrant from a judge to search the truck. He did not appear to be intimidated, frightened, or confused. After Green signed the consent form, he retrieved his property, except the screwdriver, from the booking officer and left the station.

Before trial, Green filed a motion to suppress all evidence, testimonial and physical, obtained by the police on December 31, 1987, and January 1, 1988. He argued that the police lacked authority to take him into protective custody and question him, and that his consent to search his truck was not made voluntarily. The trial court denied his motion and ruled that: (1) Brodeur had probable cause to believe that Green was intoxicated within the meaning of RSA 172-B:1, X (Supp. 1989) and thus lawfully took Green into protective custody; (2) Green knowingly, freely, and voluntarily spoke with the officers and answered their questions; (3) Green knowingly, freely, and voluntarily consented to the search of his truck; (4) Colby's frisk of Green was illegal; and (5) Green's screwdriver would inevitably have been discovered "during good faith, proper, and predictable protective custody procedures . . . independently of, and without benefitting from, Lt. Colby's illegal frisk."

The screwdriver was presented as evidence at trial to show that it could have been used to slash Dorothy Richards's tires on the night of the fire. Additionally, the driver's license was important to the State's case because Dorothy Richards used it for identification purposes in writing a check to make a purchase on December 31, 1987. Green later admitted to Dorothy Richards on police recorded tape

that he had been in her house that evening and had stolen the items found in his truck out of anger. On appeal, Green raises four issues of trial court error, which we will address in turn.

## I. *Protective Custody*

■ Green first argues that his initial stop at the scene of the fire on December 31, 1987, was unreasonable. He alleges that the police lacked an articulable suspicion warranting an investigative stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). To justify such a stop, the State must show that there existed a particularized and objective basis for believing that the person detained was, or was about to be, engaged in some criminal activity. *See State v. Parker*, 127 N.H. 525, 529–30, 503 A.2d 809, 811–12 (1985). He claims that since the police lacked such articulable suspicion, the observations the police made concerning his lack of sobriety, upon which they based their decision to take him into protective custody, were the fruits of an unlawful seizure.

■ The defendant's argument fails for the simple reason that when the police prevented the defendant from approaching a secured crime scene, they did not need an articulable suspicion that the defendant was, or was about to be, engaged in some criminal activity. The police must be permitted to regulate the movements of civilians at crime scenes, particularly where, as here, the scene has been sealed off by barricades. The police acted reasonably when they stopped the defendant, who had advanced past the police barricade, and asked him questions. They also frisked him, which the trial court found was improper. However, the fact remains that the defendant, by his own conduct, placed himself in a position where the police had no option but to stop him and observe his intoxicated condition.

Green's next argument is that the police lacked sufficient evidence of "substantial impairment" to take him into protective custody pursuant to RSA chapter 172-B. Therefore, he contends that all products of the custody, including his statements made to the police on January 1, 1988, and the items found in his truck, should have been suppressed before trial.

RSA 172-B:3, I (Supp. 1989) reads in pertinent part:

> "When a peace officer encounters a person who, in the judgment of the officer, is intoxicated as defined in RSA 172-B:1, X, the officer may take such person into protective custody . . . ."

"Intoxicated" is defined in RSA 172-B:1, X (Supp. 1989) as "a condition in which the mental or physical functioning of an individual is

substantially impaired as a result of the presence of alcohol in his system."

██ Brodeur and Colby both observed Green's bloodshot, glassy eyes, his slurred speech and the odor of alcohol on his breath, all characteristic signs of intoxication. Colby discovered a can of beer by Green's truck and a small fire on the front seat. When Green misunderstood the officers' directions to move his truck and smashed into a police cruiser, he undoubtedly convinced the officers that he was "substantially impaired as a result of the presence of alcohol in his system." The trial court did not err in ruling that the police "had probable cause to reasonably conclude that defendant should be placed in protective custody within the meaning of RSA 172-B:1, XIII (Supp. 1989)."

II. *Police Interview*

Green's next argument is that he was still in custody at the time Brodeur and Richards interviewed him, and since the police lacked probable cause to hold him in custody at that time, Green's rights under part I, article 19 and under the fourth and fourteenth amendments were violated, and all statements made to them and all products of the truck search should have been suppressed before trial.

Since he was given his *Miranda* warnings before the questioning began, Green is not arguing that he was not properly apprised of his constitutional right to an attorney and protection against self-incrimination. Rather, he argues that the police officers lacked constitutional authority to hold him in custody, and thus any statements made to the police during that interview should have been suppressed. *See State v. Tapply*, 124 N.H. 318, 326, 470 A.2d 900, 905 (1983). The first question before us, therefore, is whether Green was in police custody at the time Brodeur and Colby interviewed him. Since we find no error in the trial court's finding that he was not in custody, we need not decide whether custody would have been lawful.

██ We first note that custody determinations "are essentially factual, and we will uphold the superior court's rulings unless contrary to the manifest weight of the evidence or the result of an error of law." *State v. Carpentier*, 132 N.H. 123, 126, 562 A.2d 181, 183 (1989). An individual is "seized" for purposes of the fourth and fourteenth amendments to the Federal Constitution "if, in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The standard for judging whether

a person has been seized for purposes of part I, article 19 of the New Hampshire Constitution is no less protective of our citizens' rights. *See State v. Riley,* 126 N.H. 257, 262, 490 A.2d 1362, 1366 (1985).

> "In the absence of formal arrest, the trial court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering 'how a reasonable man in the suspect's position would have understood his situation.' *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). In reaching its decision, the trial court should consider, among other factors, the suspect's familiarity with his surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character. *United States v. Masse,* 816 F.2d 805, 809 (1st Cir. 1982)."

*State v. Carpentier, supra* at 126–27, 562 A.2d at 183.

The record provides ample support for the trial court's finding that Green was not in custody. Although Green was brought to the interview room at the end of his protective custody and without many of his possessions, he was, according to the trial court, "told and understood that the police had no evidence or charges against him, that he was not under arrest, that he was sober and no longer in protective custody, and that he was free to go without answering any questions." Green was not physically restrained, and the tone of the interview was relaxed, non-accusatory, and informal.

Green also points to the officers' reading of the *Miranda* warnings to bolster his argument that he was in police custody during the interview. *See. United States v. Poitier,* 818 F.2d 679, 683 (8th Cir. 1987), *cert. denied,* 484 U.S. 1006 (1988) ("accusation, coupled with *Miranda* warnings, created a sufficient show of authority to effectively restrain Poitier's freedom of movement"). While the reading of *Miranda* warnings may be a factor in deciding whether a person is in custody under some circumstances, here the police made no accusations to Green during the interview. Brodeur testified he was simply acting in a "super-cautious" fashion when he informed Green of his *Miranda* rights. However, at no time did the police state to the defendant that they believed he was involved in the crimes of which he was later charged.

In sum, the trial court's finding that a reasonable person in Green's position would have believed he was free to leave the police station and not answer Brodeur's and Colby's questions is supported by the record. Thus, Green's rights under the fourth and fourteenth

amendments of the Federal Constitution and part I, article 19 of the State Constitution were not violated, and the statements he made to the police during that interview were properly admitted at trial.

III. *Search of Green's Truck*

Third, Green argues that his consent to search his truck was not voluntarily given and that, therefore, his rights under part I, article 19 and under the fourth and fourteenth amendments were violated and all items found by the police during their search of the truck should have been suppressed before trial. He argues that the "consent" was a product of police coercion.

 We note again the applicable review standard: "In reviewing a trial court's finding of voluntary consent, we will not overturn the finding unless it is without support in the record." *State v. Pinder*, 126 N.H. 220, 223, 489 A.2d 653, 655 (1985).

> "Whether the defendant consented to the police entry into his room is a question of fact to be determined by the trial court. *State v. McGann*, 124 N.H. 101, 105, 467 A.2d 571, 574 (1983). The court must determine, based on the 'totality of the circumstances,' whether the State has met its burden of proving by a preponderance of the evidence, *id.* at 105–06, 467 A.2d at 574, that the consent was 'free, knowing, and voluntary.' *State v. Osborne*, 119 N.H. 427, 433, 402 A.2d 493, 498 (1979)."

*State v. Jones*, 131 N.H. 726, 728, 560 A.2d 1159, 1160 (1989).

 The record supports the trial court's ruling that "[t]he State has proved by a preponderance of the evidence that defendant knowingly, freely, and voluntarily consented in writing to a search of his truck . . . ." The uncontroverted testimony of Brodeur and Colby indicates that the officers did not threaten, frighten, intimidate, or in any other way coerce Green's consent to search the truck. Although Green initially refused consent, prior refusal does not necessarily invalidate a subsequent consent as involuntary. *See, e.g., United States v. Morrow*, 731 F.2d 233, 236 (4th Cir.), *cert. denied*, 467 U.S. 1230 (1984); *United States v. Pulvano*, 629 F.2d 1151, 1157 (5th Cir. 1980). Moreover, Green no longer refused consent once the officers explained to him the nature of their investigation and promised not to use anything found in the truck against him as evidence of another crime. Thus, Green's rights under part I, article 19 of the New Hampshire Constitution were not violated, and the items found in

Green's truck pursuant to the consent search were properly admitted into evidence at trial. "We do not address the defendant's federal constitutional claim because the Federal Constitution affords him no greater protection than does the State Constitution." *State v. Wheeler*, 128 N.H. 767, 772, 519 A.2d 289, 292 (1986).

## IV. *Screwdriver*

The trial court ruled, and Green agrees, that Colby lacked authority to frisk Green and remove his screwdriver. Green therefore argues that the screwdriver should not have been admitted into evidence at the trial. We need not decide whether Green's argument has merit because even if the admission of the screwdriver into evidence were found to be error, such error would have been harmless. In *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976), we explained the doctrine of harmless error:

> "[I]t is not a question whether the evidence, apart from that erroneously admitted, would support a finding of guilt, but whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict."

The screwdriver was introduced by the State as evidence that Green was at the Richards house on the night of the crime and that he engaged in destructive conduct by slashing the tires of Dorothy Richards. However, the State had other, more compelling evidence to prove the defendant's presence at the Richards' home and his propensity to engage in unlawful conduct. Green later admitted to Dorothy Richards in a recorded phone conversation that he was in her house that night and, out of anger, stole some of her property. Further, the fact that he had in his possession the driver's license of Dorothy Richards, who had used the license earlier in the day as identification in writing a check to make a purchase, was strong evidence that he had been in her apartment on the night of the crime. Thus, given the overwhelming weight of the evidence presented against Green at his trial, including admissions of the homicides to friends, we find beyond a reasonable doubt that the admission of the screwdriver into evidence did not affect the verdict.

*Affirmed.*

All concurred.