Sullivan
No. 94-683

THE STATE OF NEW HAMPSHIRE

v.

BRIAN SCOTT SMITH

August 7, 1996

*Jeffrey R. Howard*, attorney general (*John A. Curran*, assistant attorney general, on the brief, and *Patrick E. Donovan*, assistant attorney general, orally), for the State.

*Nancy J. Gray*, public defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J. Following a jury trial in the Superior Court (*Morrill*, J.), the defendant, Brian Scott Smith, was convicted of two counts of passing bad checks in November 1993. *See* RSA 638:4 (1986 & Supp. 1993) (amended 1993). He appeals, arguing that the superior court erred in: (1) denying his motion to suppress evidence the police seized while searching his home; and (2) admitting evidence in the State's case in chief of nineteen prior bad check convictions under New Hampshire Rule of Evidence 404(b). We affirm.

## I. Motion to Suppress

The defendant first argues that the superior court should have granted his motion to suppress evidence seized from his home. In his brief, the defendant contests the seizure of items from his living room and bedroom, but in his notice of appeal, he made no objection to the items found in his living room. He has therefore waived any objection to the admission of those items, *see* SUP. CT. R. 16(3)(b); *State v. Peterson*, 135 N.H. 713, 714–15, 609 A.2d 749, 750–51 (1992), and we confine our discussion accordingly.

In December 1993, Detective Mark Phelps learned that the defendant had used bad checks to purchase two chain saws and a wood stove. Phelps contacted the defendant's wife, who told him that the articles were in the couple's trailer and that the police could come and retrieve them. On December 22, Phelps and two other officers drove to the trailer and knocked on the door. Phelps heard footsteps inside, but no one answered. The chain saws and wood stove were visible through a window.

Phelps left to apply for a search warrant, while the other two officers stayed behind. One of the remaining officers testified:

> Two females left that trailer and then some time passed and one of the females returned, went inside the trailer, exited the trailer after a couple of minutes and got back in the vehicle and left. As she was leaving, she tooted the horn a couple of times and then left the area.

When Phelps returned with a search warrant, the officers again knocked on the trailer door, but still no one answered. The officers opened the door, which was unlocked, and entered. They saw the chain saws and wood stove in the living room, approximately twenty feet from the door.

The officers then searched the rest of the trailer. At the suppression hearing, Phelps explained:

A   Chief Polland had advised us before we had entered on the search warrant that they had picked [the defendant] up from the Lebanon police department and he had two guns at that point. But the lieutenant had only taken one gun with him, so we were concerned that there may have been a subject in there from the footsteps we had heard and that there may have been a weapon in there.

Q   Had Chief Polland told you where he had observed the weapons?

A   In the bedroom next to the bed.

Q  Was there any other reason that you continued searching the trailer?

A  Also the male subject — Brian Smith — there was [a National Crime Information Center] warrant out of Lynchburg, Virginia for him.

Phelps also testified that he believed there was an outstanding bench warrant for the defendant's arrest "for jumping bail," and stated that his "primary objective" in searching the rest of the trailer was to ensure "officer safety." When the defense attorney questioned Phelps about the search, Phelps answered: "Well, are you going to immediately pick up a five hundred pound wood stove and walk out? No. We are going to have to take a few minutes to secure that, put it on a cart and remove that. In that time somebody could come down the hallway." Another officer gave a similar explanation for the decision to secure the trailer:

> I had been told also that there might be a possible weapon in the trailer, because one weapon had been taken earlier in time and also I had been told by the Lebanon police department that they had a bench warrant for the respondent, who had failed to appear for a probable cause hearing.

While searching the rest of the trailer, Phelps entered the bedroom. There he or another officer found and seized the items at issue in this appeal: a check imprinting machine, a box of blank checks, and carbons from copies of checks. The officers testified that these items were "in plain view" on a counter and on the floor.

The defendant moved prior to trial to suppress the items from evidence, but the superior court ruled them admissible, citing the plain view exception to the warrant requirement. *See State v. Murray*, 134 N.H. 613, 615, 598 A.2d 206, 207 (1991). The court found the officers' search of the bedroom a legitimate, protective sweep, and thus determined that the officers had a right to be in the bedroom when they saw the items. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990); *United States v. Daoust*, 916 F.2d 757, 759 (1st Cir. 1990).

The defendant argues that the denial of his suppression motion violated his rights under the State and Federal Constitutions. *See* U.S. CONST. amend. IV; N.H. CONST. pt. I, art. 19. We affirm the court's ruling based on our interpretation of the State Constitution. *See State v. Ball*, 124 N.H. 226, 232, 471 A.2d 347, 351 (1983). The Federal Constitution provides the defendant with no greater protections in this context. *See Buie*, 494 U.S. at 327; *Daoust*, 916 F.2d at 759; *compare Horton v. California*, 496 U.S. 128, 130 (1990)

(under Federal Constitution, plain view exception does not require inadvertent discovery) *with Murray*, 134 N.H. at 615, 598 A.2d at 207 (under State Constitution, plain view exception requires inadvertent discovery). We therefore make no holding under the Federal Constitution and use federal cases only as guides to our State constitutional analysis. *State v. Fitzgerald*, 137 N.H. 23, 26, 622 A.2d 1245, 1246 (1993); *see Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).

The starting point for our analysis is part I, article 19 of our constitution, which provides that "[e]very subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." "[W]arrantless entries are *per se* unreasonable and illegal, unless the entry is made pursuant to one of a few recognized exceptions." *State v. Santana*, 133 N.H. 798, 803, 586 A.2d 77, 80 (1991) (quotation omitted). "Absent a warrant, the burden is on the State to prove that the search was valid pursuant to one of these exceptions." *State v. Sterndale*, 139 N.H. 445, 447, 656 A.2d 409, 410 (1995).

This court has recognized a plain view exception to the warrant requirement under the State Constitution.

> [T]here are three criteria that the State must prove by a preponderance of the evidence for justifying a seizure under this exception: (1) [t]he initial intrusion which afforded the view must have been lawful; (2) the discovery of the evidence must have been inadvertent; and (3) the incriminating nature of the evidence must have been immediately apparent.

*Murray*, 134 N.H. at 615, 598 A.2d at 207 (quotation omitted). The defendant argues only the first criterion, contending that the police were not lawfully in his bedroom when they discovered the items at issue.

■ The State argues that the police had a legitimate concern for their safety when they entered the defendant's trailer and that this concern justified a protective sweep of the bedroom. We agree. In *Buie*, the United States Supreme Court held that under the principles of *Terry v. Ohio*, 392 U.S. 1 (1968), and *Michigan v. Long*, 463 U.S. 1032, "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337. Such a sweep, "aimed at protecting the arresting officers, if justified

by the circumstances," *id.* at 335, is properly limited if it extends "only to a cursory inspection of those spaces where a person may be found. The sweep [may] last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises," *id. See generally* 3 W. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.4(c), at 323–35 (3d ed. 1996). The United States Court of Appeals for the First Circuit has applied the *Buie* holding to protective sweeps made, as here, in conjunction with a search warrant. *Daoust,* 916 F.2d at 759.

Professor LaFave notes that courts sometimes reject searches beyond the area permitted by the warrant, but states: "[I]t does seem that self-protection is a legitimate factor to be taken into account and that sometimes a protective sweep beyond the boundaries stated in the search warrant would be reasonable." 2 LAFAVE, *supra* § 4.10(a), at 659. Although intrusions into a person's home should never be undertaken lightly because of the "strong expectation of privacy and protection from government intrusion," *Santana,* 133 N.H. at 803, 586 A.2d at 80 (quotation omitted), we recognize that there an officer sometimes faces the greatest danger. An officer on an "adversary's 'turf' . . . [risks] ambush in a confined setting of unknown configuration." *Buie,* 494 U.S. at 333.

■ We have previously recognized the reasonableness of limited intrusions for the protection of police officers and others, *see State v. Theodosopoulos,* 119 N.H. 573, 582, 409 A.2d 1134, 1140 (1979), *cert. denied,* 446 U.S. 983 (1980); *State v. Gosselin,* 117 N.H. 115, 119–20, 370 A.2d 264, 268–69 (1977). Moreover, we have adopted the holding of *Terry,* 392 U.S. at 30, *see State v. Brodeur,* 126 N.H. 411, 415, 493 A.2d 1134, 1137 (1985), which is the foundation for *Buie* and *Daoust, see Buie,* 494 U.S. at 331–34; *Daoust,* 916 F.2d at 759. We hold that the principles stated in *Buie* and *Daoust* are legitimate extensions of our own search and seizure law under part I, article 19 of the New Hampshire Constitution. Our constitution should not be interpreted to deny police officers the right to protect themselves from harm. *Cf.* 3 LAFAVE, *supra* § 6.4(c), at 324. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry,* 392 U.S. at 23. We believe that the test articulated in *Buie,* quoted above, correctly "balanc[es] the need to search against the invasion which the search entails," *id.* at 21 (quotation and brackets omitted), and thus heeds our constitution's proscription against unreasonable searches.

■ The question remains whether the search of the defendant's bedroom complied with the requirements of *Buie.* We hold that it

did. At the time the officers decided to conduct the protective sweep, they knew that the defendant had skipped bail and that there was an outstanding warrant for his arrest. They also knew that the defendant owned a gun, and that this gun was last seen in his bedroom. Finally, they knew that, when they arrived at the trailer, someone was inside and refused to come to the door after they knocked and announced their presence. Although two women later left the trailer, one of them sounded her car horn as she drove away.

Based on these "specific and articulable facts," *Buie*, 494 U.S. at 337, the police could have had "a reasonable belief . . . that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene," *id.* The woman's use of the car horn is puzzling and could have been explained as a signal to someone still in the trailer. The outstanding arrest warrant and the defendant's act of skipping bail paint him as a person willing to defy authority. The officers' information about the gun also raised a legitimate and substantial concern for their safety. Accordingly, the police were permitted to conduct "a cursory inspection of those spaces where a person may be found." *Buie*, 494 U.S. at 335.

The defendant argues that the officers' search of his bedroom was not cursory and not properly limited. In support, he states in his brief that the police

> looked through the back bedroom closely enough to identify a Paymaster check imprinter . . . [and] read checks as made out to DMS Rentals and read the amount of one check made out to Amigo Rentals. They were, also, able to read that a box of checks that was lying on the floor were made out to Amigo Rentals.

(Citations omitted.)

We find the officers' identification of these items consistent with a limited, cursory inspection of the bedroom. The trial court so found after hearing testimony and assessing the witnesses' credibility. Upon review of the record, we cannot say that no reasonable trier of fact could have reached that conclusion. An officer searching places where someone could be hiding could easily spot and identify such objects. The officers found the items on a counter and on the floor of the bedroom. It should be remembered that the police were investigating a case involving several bad checks; it does not strain logic to assume that their eyes were instantly drawn to anything related to check-writing. We reject the defendant's argument and conclude that the superior court properly denied his motion to suppress.

## II. Prior Convictions

██ The defendant next contends that the superior court erred in admitting evidence of his nineteen prior bad check convictions under Rule 404(b). We agree.

> Evidence of other crimes is not admissible unless: (1) it is relevant for a purpose other than to show the defendant's bad character or disposition; (2) there is clear proof that the defendant committed the other crimes or acts; and (3) prejudice to the defendant does not substantially outweigh the probative value of the evidence.

State v. Bassett, 139 N.H. 493, 496, 659 A.2d 891, 894 (1995). The evidence of the prior convictions fails the first prong of this test. The State bore the burden of proving that the defendant passed the checks knowing that the account on which they were drawn had insufficient funds for payment. See RSA 638:4. The trial court admitted the prior convictions to prove intent, but the prosecutor read them into evidence without stating whether any of them involved the account at issue in this case. The prior convictions were therefore relevant to intent only if the jury drew the impermissible inference that, because the defendant knowingly passed bad checks before, he must have done so on this occasion. See Bassett, 139 N.H. at 500, 659 A.2d at 896. Accordingly, we hold that the trial court erred in admitting the prior bad check convictions.

## III. Harmless Error

██ Although the trial court erred, the State correctly contends that this case presents the rare instance of a harmless Rule 404(b) error. See State v. Davis, 139 N.H. 185, 192, 650 A.2d 1386, 1390 (1994). The standard for ascertaining whether an error can be deemed harmless is as follows:

> In determining the gravity of an error, this court asks whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict. The evaluation of whether this standard has been achieved involves consideration of the alternative evidence presented at trial and of the character of the inadmissible evidence itself. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt.

*State v. Vandebogart*, 139 N.H. 145, 157–58, 652 A.2d 671, 679 (1994) (citations and quotations omitted). We have engaged in a harmless error analysis in a prior Rule 404(b) case. *See Bassett*, 139 N.H. at 502–03, 659 A.2d at 898.

To prove that the defendant committed the charged offenses, the State had to show that: (1) the defendant issued or passed the checks in question; (2) the drawee refused payment on the checks; and (3) the defendant knew or believed that payment would be refused. RSA 638:4. The prosecutor and the defense attorney stipulated at trial that the defendant passed the checks. Thus, the State had only to prove that the drawee refused payment on the checks and that the defendant knew or believed that this would happen.

Evidence that the drawee refused payment on the checks was uncontroverted. The two store managers who accepted the checks testified at trial. Each stated that the drawee refused payment. The jury heard no contradicting evidence, and in closing, the defense attorney did not dispute the issue whatsoever.

Evidence of the defendant's intent was equally compelling. The defendant passed the checks on November 21 and 28, 1993. A September 10, 1992, letter to the defendant's wife informed her that the account on which the checks were written had been closed. According to the testimony of two police officers, the defendant twice admitted knowing the status of the account before he passed the checks. One officer from Lynchburg, Virginia stated that he met with the defendant on October 8, 1993, to discuss other checks that had been written on that account. At that meeting, the officer informed the defendant that the account had been closed. The defendant promised to remedy the problem, but never did, to the officer's knowledge. The other officer, from Lebanon, testified that he spoke with the defendant on December 16, 1993, to discuss one of the checks at issue in this case. The defendant denied passing the check but admitted knowing in early November 1993 that the account had been closed. During cross-examination and in closing argument, the defense attorney made no attempt to impugn either of the officers' credibility. In a brief closing argument, the attorney implied that the defendant had indeed made the admission that he knew the account was closed, but suggested that the defendant did so in order to protect his wife, although there was not a shred of evidence in the record that the defendant's wife passed the checks in question.

As in *Vandebogart*, "the nature, quantity, and weight of [this evidence] can only be described as overwhelming." *Vandebogart*,

139 N.H. at 158, 652 A.2d at 679; *see also State v. Fecteau*, 133 N.H. 860, 869, 587 A.2d 591, 595–96 (1991); *State v. Green*, 133 N.H. 249, 260, 575 A.2d 1308, 1315 (1990). Although the admission of the defendant's prior convictions undoubtedly prejudiced him, *see Bassett*, 139 N.H. at 502, 659 A.2d at 898, a review of the record puts to rest any concern that their admission denied the defendant a fair verdict. The prosecutor introduced them simply by reading the date of each conviction, the name of the offense, and the rendering jurisdiction. She supplied none of the details or circumstances of the crimes and made no further mention of them, even in her closing argument to the jury.

In addition, the prior convictions did not involve acts of an "odious [or] provocative nature," *State v. Carter*, 140 N.H. 1, 5, 662 A.2d 289, 291 (1995), such as sexual assault or homicide. Thus, this evidence was less likely to "appeal[] to the jury's sympathies, arouse[] its sense of horror, provoke[] its instinct to punish, or trigger[] other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case." 1 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 404[03], at 403–37 to 403–41 (1995) (construing Federal Rule of Evidence 403). Thus, the prior convictions were "inconsequential in relation to the strength of the State's evidence of guilt," *Vandebogart*, 139 N.H. at 158, 652 A.2d at 679, leading to the conclusion, beyond a reasonable doubt, that the inadmissible evidence did not affect the verdict, *id.* at 157, 652 A.2d at 679. This case presents a rare instance of an erroneous, but harmless admission of evidence pursuant to Rule 404(b). This finding of harmlessness in no way weakens our holdings in recent opinions construing Rule 404(b). *See, e.g., Bassett*, 139 N.H. at 499–502, 659 A.2d at 896–98.

*Affirmed.*

THAYER, J., with whom HORTON, J., joined, concurred specially; BRODERICK, J., with whom BROCK, C.J., joined, concurred in part and dissented in part.

THAYER, J., concurring specially: This case again highlights the different views held by members of this court concerning what types of evidence are relevant under New Hampshire Rule of Evidence 404(b). Although I concur in the result reached in the opinion of Justice Johnson, I write separately to explain why I believe the trial court correctly held that the defendant's prior convictions were relevant.

The defendant was charged with two counts of passing bad checks. *See* RSA 638:4 (1986 & Supp. 1993) (amended 1993). His criminal

record included nineteen prior convictions for similar offenses. At trial, in an effort to prove that the defendant knowingly committed the crimes charged, the prosecutor read into evidence all of the defendant's prior convictions. In each case, the prosecutor referred to the specific crime charged and in most cases also referred to the date of the conviction and the location of the offense. With three of the prior convictions, the prosecutor mentioned that the bank on which the bad checks were drawn was the same bank involved in this case.

As early as 1876, we held that this type of evidence could be relevant. *State v. Lapage*, 57 N.H. 245 (1876). In *Lapage*, we explained that when a defendant is charged with a crime involving counterfeit money, proof that the defendant previously engaged in similar conduct is relevant to demonstrate that he knowingly did so again. We reasoned:

> It might well happen that a person might have in his possession a single counterfeit bill or coin without knowing it to be such; but he would be much less likely to do so twice, and every repetition of such an act would increase the probability that he knew that the bills or coins were counterfeit.

*Id.* at 293–94. The reasoning in *Lapage* applies with equal force in this case. The fact that the defendant wrote bad checks in the past makes it more likely that he knowingly wrote the bad checks at issue here because his prior experience would have made him aware of his financial circumstances and less likely to unintentionally write a check on a closed account. *Cf. State v. Anderson*, 912 P.2d 801, 804 (Mont. 1996) (evidence of prior conviction for bad check offense relevant under Rule 404(b) on issue of intent). The rules of relevance require no greater connection between the charged conduct and the prior bad acts. *See* N.H. R. Ev. 401; *State v. McGlew*, 139 N.H. 505, 507, 658 A.2d 1191, 1193 (1995).

A majority of this court holds that the defendant's prior convictions should have been excluded from evidence because "the prosecutor [introduced the convictions] . . . without stating whether any of them involved the account at issue in this case." That majority apparently believes that for the prior offenses to be relevant, they must have involved the same account as the one at issue here. It does not offer reasons to justify that limitation; nor does it attempt to distinguish our prior case law. *See Lapage*, 57 N.H. at 293–94.

In addition to believing that the defendant's prior convictions were relevant, I also believe the other two prongs of the Rule 404(b)

analysis were met. *State v. Bassett*, 139 N.H. 493, 496, 659 A.2d 891, 894 (1995). Accordingly, I would affirm the trial court's ruling that the prior convictions were admissible under Rule 404(b).

HORTON, J., joins in the special concurrence.

BRODERICK, J., concurring in part and dissenting in part: I agree with the opinion of Justice Johnson that the trial court was correct in denying the defendant's motion to suppress. But I cannot concur in the conclusion that the erroneous admission of the defendant's nineteen prior convictions was harmless error; accordingly, I respectfully dissent from part III of the opinion of Justice Johnson.

I

The defendant was charged with two counts of passing bad checks. *See* RSA 638:4 (1986 & Supp. 1993) (amended 1993). Before trial, the defendant sought to prevent the introduction of evidence of his nineteen prior convictions for bad check offenses. The trial court ruled the prior convictions admissible to prove intent. At the conclusion of the trial, the court instructed the jury that it could consider the prior convictions only in respect to the question whether the defendant possessed the requisite criminal intent to pass the bad checks at issue. Following this instruction, the prosecutor proceeded to read into the record, without additional explanation, each of the prior convictions and, for some, the date of the offense, the State in which it occurred, and the bank involved.

Evidence of other bad acts is admissible under New Hampshire Rule of Evidence 404(b) only "if relevant for a purpose other than to prove the defendant's character or disposition, if there is clear proof the defendant committed the other acts, and if the prejudice to the defendant does not substantially outweigh the probative value of the evidence." *State v. Kirsch*, 139 N.H. 647, 653, 662 A.2d 937, 942 (1995). We will not disturb the trial court's decision to admit such evidence absent an abuse of discretion. *Id.*

Evidence of the defendant's prior convictions was irrelevant under the first prong of the Rule 404(b) analysis. The State sought to introduce evidence of the prior convictions for bad check offenses to prove that he committed the crimes charged with the requisite intent. "To be relevant to intent, evidence of other bad acts must be able to support a reliable inference, not dependent on the defendant's character or propensity, that the defendant had the same intent on the occasions of the charged and [prior] acts." *State v. Bassett*, 139 N.H. 493, 499, 659 A.2d 891, 897 (1995). In this case, it is unclear how the defendant's intent on prior occasions is probative

of his intent to pass bad checks on the occasions charged. Though the prior episodes demonstrate that the defendant was not above passing a bad check, and may, therefore, be of questionable character, absent some nexus to the crimes charged, evidence of the defendant's prior convictions is properly deemed irrelevant. *See id.* at 500, 659 A.2d at 896.

## II

The State argues that even if the evidence should not have been admitted under Rule 404(b), the error was harmless. Our inquiry in a harmless error analysis is not "whether the evidence, apart from that erroneously admitted, would support a finding of guilt, but whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict." *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976). In other words, the question is "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error," *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993), and we must resist a natural temptation simply to "conflate the harmlessness inquiry with our own assessment of a defendant's guilt," Edwards, *To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. REV. 1167, 1170 (1995).

In undertaking a harmless error analysis, we first must determine what evidence the jury considered as tending to prove or disprove a fact necessary to reach its verdict — in this case, that the defendant had the criminal intent to commit the crime charged. *See Yates v. Evatt*, 500 U.S. 391, 404 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62 (1991). Because we cannot peer into the jurors' minds, we look instead to the instructions given the jury, working from the assumption "that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so." *Id.*

At trial, the State had to prove that the defendant committed the charged offense knowingly. *See* RSA 638:4. With respect to proof of the defendant's intent, the court below instructed the jurors that they could use the defendant's prior convictions

> for the purpose of determining whether [the defendant] on the dates and times that he's alleged to have passed these bad checks knew what he was doing, that is, had the requisite criminal intent, and knew that those accounts or that account was closed or had insufficient funds as alleged by the State.

In view of this instruction, we must presume that the jurors did, in fact, consider the erroneously admitted evidence of the prior convictions in reaching their verdict.

Next, we must weigh the probative force of the other evidence considered by the jury as against the force of the erroneously admitted convictions. *See Yates*, 500 U.S. at 404. The issue at this point is whether the jury actually rested its verdict on evidence establishing the defendant's intent beyond a reasonable doubt apart from the erroneously admitted convictions. Because we cannot see into the jurors' minds, we must ask "whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the [erroneously admitted convictions]." *Id.* at 405. Only if the effect of the erroneously admitted evidence is "comparatively minimal to this degree" can we say that it "did not contribute to the verdict rendered." *Id.*

Here, the State's evidence apart from the defendant's prior convictions was forceful. Officer Dennis Lariviere testified that he informed the defendant before the checks were passed that the checking account at issue was closed, and Officer Matthew Hogan testified that the defendant said he knew prior to passing the checks that the account was closed. This was, and is, compelling evidence that the defendant committed the crimes charged with the requisite intent.

Simply because the State presented other probative evidence, however, does not automatically render the prior convictions meaningless for purposes of a harmless error analysis. These prior convictions, by virtue of their similarity to the crime charged, had great force of themselves. It would be disingenuous to argue that this evidence was inconsequential; indeed, we have held that a prior conviction "is probably only equalled by a confession in its prejudicial impact upon a jury." *Bassett*, 139 N.H. at 502, 659 A.2d at 898 (quotation omitted); *see also State v. Skidmore*, 138 N.H. 201, 202, 636 A.2d 64, 65 (1993).

The question, then, is whether the testimony of the police officers, along with the other evidence of intent, was so overwhelming as compared to evidence of the defendant's nineteen prior convictions that we can conclude, beyond a reasonable doubt, that the latter evidence did not affect the jury's verdict. I do not believe we can. The force of the erroneously admitted convictions was not so "comparatively minimal" as to ensure that the verdict would have been the same in their absence. *See Yates*, 500 U.S. at 405. The

number and nature of the convictions could well have persuaded a juror to find that the defendant possessed the requisite intent on the occasions charged simply because he had manifested that intent in the past. At the least, this evidence was precisely the kind with which a juror would likely and reasonably resolve any lingering doubts about the defendant's guilt.

Given the prejudicial impact of the prior convictions and the fact that the trial court expressly instructed the jury that it could consider the evidence in determining whether the defendant acted with the requisite criminal intent on the occasions charged, I cannot say that the guilty verdict in this case "was surely unattributable to the error." *Sullivan*, 508 U.S. at 279. Consequently, I cannot conclude that the erroneous admission of the defendant's nineteen prior convictions was harmless beyond a reasonable doubt. *See Bassett*, 139 N.H. at 502, 659 A.2d at 898.

## III

A primary rationale for the harmless error doctrine is the maintenance of public respect for the criminal process by not reversing when a trial error is deemed immaterial. *See Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). We should remember, however, that "[w]hen we hold errors harmless, the rights of individuals, both constitutional and otherwise, go unenforced." *Edwards, supra* at 1170. Moreover, "if committing an error has no adverse effect on the [S]tate, the deterrence of official misbehavior becomes difficult," Mitchell, *Against "Overwhelming" Appellate Activism: Constraining Harmless Error Review*, 82 CAL. L. REV. 1335, 1366 (1994), a circumstance equally likely to erode public confidence in the integrity of our criminal justice system.

BROCK, C.J., joins in the opinion of BRODERICK, J.