CONBOY, J., concurring in part and dissenting in part.
I concur in the conclusions set forth in Sections III, IV, and V of the majority's opinion. I disagree, however, with the majority's conclusion in Section II that the trial court did not err in ruling that the defendant's testimony about the July 11 visit to the Hampstead home, prior to the July 18 invasion of the home, opened the door to evidence that he was involved in a Manchester homicide. Because I conclude that the admission of this testimony was error and that this error was not harmless, I respectfully dissent.
During trial, in response to defense counsel's question as to whether he had ever been to the "house in Hampstead," the defendant testified that he thought the purpose of the July 11 visit was to buy an illegal gun. He said:
Angel Sanchez had translated something that [Holli Soltish] had said. I want [ed] to buy an illegal gun. And she proposed to Angel that she knew someone who had a license to purchase guns. And she brought me to this place in New Hampshire. And she told me that she was going to talk to that person.
(Emphasis added.) Subsequently, the State argued that the defendant's testimony portrayed him as a "wide-eyed innocent" with respect to the July 11 trip, and, therefore, the defendant had "open[ed] the door to the other acts," "to other information that he would have been aware of, because he was involved."
The trial court agreed with the State, ruling that the defendant's "testimony about being at the scene in Hampstead for a wholly innocent reason" opened the door to testimony about "his involvement in other cases." Specifically, the court ruled that the defendant had opened the door to allow the State
*1100 to show that he was fully part of this plan to engage in these home invasions, that he knew full well why they were going there, because he had done it before, and he did it again. And this is part of the pattern of conduct that he and the other two [conspirators] are engaged in.
The State subsequently asked the defendant whether he had been questioned about a murder in Manchester, and whether he was investigated "for [a separate] home invasion," but it did not question him about the details of his involvement in either crime. Later, the court ruled that it would not allow rebuttal evidence regarding other home invasions, but that it would allow evidence of the Manchester homicide. It stated that
the evidence the State proffered ... with respect to the Manchester homicide is tightly tied to the purpose of the trip on July 11th. It is very close in time. It is within hours of that trip. There is specific information that the Defendant was involved in that both from [Aneudys] Menendez'[s] testimony that [the defendant] bragged about it afterwards and the affiliate, the timing of it, and the affiliation of the phones with that location where the homicide occurred. So I think that that evidence does go directly to contradict [the defendant's] testimony that that trip to Hampstead was essentially an innocent trip to buy a gun from a licensed gun dealer.
Thus, although the defendant testified that his goal on July 11 was to buy an illegal gun, the trial court nonetheless concluded that the defendant's testimony conveyed two possible misimpressions: (1) "that [the] trip to Hampstead was innocent," or (2) that the defendant "misunderstood the purpose of why they were going there." Accordingly, the trial court allowed the State, on rebuttal, to call Menendez.
Menendez testified that the defendant and Sanchez showed him a video "news clipping" about the homicide and "were just bragging about they murdered a man the previous night or something like in those terms." He testified that he learned that "[i]t was suppose[d] to be a ... robbery, or a drug or a hit," but that "[t]he man reacted a way that they didn't like and they opened fire on him." He stated that "[t]hey showed [the video] to me like three times because they kept going back, showing me specific places where they stood and, you know, what the house looked like or the porch and, you know, this happened, that happened type of thing."
The majority concludes that, pursuant to the specific contradiction doctrine, the defendant's testimony opened the door to Menendez's testimony, as well as to other evidence regarding the Manchester homicide, by creating a misleading impression that "he did not know about the [theft by unauthorized taking] conspiracy or the true purpose of the [July 11] trip because he had been kept in the dark by his companions." It explains that
by claiming that he thought the purpose of the trip to Hampstead on July 11 was to buy a gun from someone, the defendant injected a new issue into the case. The defendant had no obligation to describe his reasons for joining the group on this trip, nor was he required to create an impression of himself as a person who merely wanted to buy a gun (whether legal or illegal). Once he did so, however, he opened the door for the State to present evidence that rebutted the implications of his testimony.
For the specific contradiction doctrine to apply, a party must introduce evidence that provides a justification, beyond mere relevance, for the opponent's introduction of evidence that may not otherwise be admissible. State v. Wamala , 158 N.H. 583, 589-90, 972 A.2d 1071 (2009). The initial *1101 evidence must, however, have reasonably misled the fact finder in some way. Id. at 590, 972 A.2d 1071. The rule thus prevents a party from successfully excluding evidence favorable to his opponent, and then selectively introducing this evidence for his own advantage, without allowing the opponent to place the evidence in proper context. State v. Bird , 161 N.H. 31, 35, 8 A.3d 146 (2010) ; see also State v. Carlson , 146 N.H. 52, 56, 767 A.2d 421 (2001). The fact that the door has been opened, however, "does not, by itself, permit all evidence to pass through. The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice." State v. Trempe , 140 N.H. 95, 99, 663 A.2d 620 (1995) (quotation omitted).
Given all of the circumstances, I cannot conclude that the admission of the Manchester homicide evidence is supportable under the specific contradiction doctrine. The State contends that "a statement that the defendant did not understand the criminal purpose of the group's trip to Hampstead can create the impression that he did not understand the criminal purpose because he did not generally engage in criminal activity." However, the record contradicts this contention. The defendant testified that he "want[ed] to buy an illegal gun." (Emphasis added.) This testimony cannot fairly be characterized as an effort by the defendant to portray himself as someone who generally does not engage in criminal activity. Nor did he suggest, as the trial court concluded, that he was "at the scene in Hampstead for a wholly innocent reason."
I recognize that the majority correctly observes that the defense did not at trial, and does not on appeal, rely upon the defendant's testimony that he wanted to buy an illegal gun. Nonetheless, I cannot ignore the record testimony, and in the absence of evidence or even argument that there was a transcript error, I decline to so speculate. Further, I note that following the defendant's statement that his goal was to buy an illegal gun, the defendant admitted upon questioning by his counsel, that he did not have a license, and had not applied for a license, to carry a gun in Massachusetts.
Even assuming, however, that the defendant did not use the word "illegal" in referring to the gun he planned to purchase, and that his testimony created a misleading impression regarding his understanding of the purpose of the July 11 trip to Hampstead, I do not believe that Menendez's testimony regarding a subsequent, unrelated homicide placed the defendant's testimony in its "proper context" or otherwise dispelled that misleading impression. See State v. Lopez , 156 N.H. 416, 423, 937 A.2d 905 (2007) (concluding that evidence that New Hampshire police officer did not see tears on defendant during interview would not have been placed in its proper context by introducing evidence that defendant cried at a different interview with New Jersey police on a different day). Unlike the cases upon which the majority relies, in which the proffered evidence specifically contradicted certain trial testimony, see State v. Cannon , 146 N.H. 562, 776 A.2d 736 (2001) ; Carlson , 146 N.H. at 52, 767 A.2d 421, Menendez's testimony regarding the defendant's alleged involvement in the Manchester homicide did not specifically contradict the defendant's testimony regarding his understanding of the purpose of the July 11 trip to Hampstead.
In Cannon , a sexual assault case, the complainant testified at trial that she told the defendant "no" and did not consent to sexual relations with him because she had a boyfriend. Cannon , 146 N.H. at 563-64, 776 A.2d 736. On appeal, the defendant argued that the trial court erred by excluding testimony that the complainant *1102 had had consensual sexual relations with someone other than her boyfriend one or two weeks prior to the alleged assault for which the defendant was being tried. Id. We agreed, concluding that, although the complainant "had no obligation to explain her reasoning for not consenting," once she offered an explanation at the request of the State, "the defendant was entitled to present evidence to refute her assertion." Id. at 565, 776 A.2d 736.
In Carlson , the defendant appealed his conviction of felonious sexual assault for unlawfully engaging in sexual penetration with a person who was under the age of sixteen. Carlson , 146 N.H. at 52, 767 A.2d 421. At trial, the defendant testified that, at some point during the evening of the assault, he said, "I'm leaving. This isn't me." Id. at 56, 767 A.2d 421 (quotation omitted). On appeal, the defendant argued that the trial court erred in ruling that this testimony had opened the door to testimony that he had previously engaged in sexual intercourse with an underage female. Id. at 54, 56, 767 A.2d 421. We concluded that the jury could have viewed his "statement as an assertion that his conduct and intentions that night were an anomaly and that he was not of a character to engage in those activities," id. at 57, 767 A.2d 421, and, therefore, the trial court did not err in ruling that he had opened the door to testimony that he had previously engaged in sexual relations with underage females, id. at 57-58, 767 A.2d 421.
Here, evidence that the defendant participated in a subsequent homicide with the theft conspirators did not specifically refute any misleading impression created by his testimony regarding his knowledge of the true purpose of the earlier Hampstead trip. Without more, it does not logically follow that, because there was evidence that the defendant participated in the homicide, he was aware of the purpose of the Hampstead trip. Cf . State v. Bassett , 139 N.H. 493, 500, 659 A.2d 891 (1995) ("The problem is that even if the accused entertained a certain intent during a similar uncharged incident, the accused may not have formed that intent on the charged occasion." (quotation and brackets omitted)).
As we have long held, and continue to maintain, evidence of other wrongs is inadmissible to prove disposition to commit such acts. See Trempe , 140 N.H. at 99, 663 A.2d 620 (addressing the admission of prior bad act evidence pursuant to the opening the door doctrine); see also N.H. R. Ev. 404(b). To be relevant, evidence of other bad acts must support a reliable inference, not dependent upon the defendant's character or propensity, that the defendant was aware of, and participated in, the charged acts as well as the uncharged acts. See Bassett , 139 N.H. at 499, 659 A.2d 891 (considering whether trial court erred in admitting evidence of defendant's prior conviction and sentence to prove intent to commit the charged crimes); see also N.H. R. Ev. 404(b). In this case, the inference the State sought to have the jury draw would be reliable only if there was sufficient support for a conclusion that the defendant's purported participation in the Manchester homicide (for which, at the time of trial, the defendant had not been charged) and his knowledge of the purpose of the trip to Hampstead were "closely connected by logically significant factors." Bassett , 139 N.H. at 499, 659 A.2d 891. Although temporal proximity between charged and uncharged bad acts is one factor to be considered, it cannot, alone, support a reliable inference of shared knowledge. See id.
The majority cites United States v. Pelletier , 666 F.3d 1 (1st Cir. 2011), and United States v. Rodriguez , 215 F.3d 110 (1st Cir. 2000), to support its conclusion that the Manchester homicide evidence properly *1103 rebutted the defendant's testimony about the July 11 trip. These cases, however, are factually distinguishable from this case.
In Pelletier , the defendant "was convicted of various counts related to his role in the importation, possession and distribution of marijuana." Pelletier , 666 F.3d at 3. On appeal, the defendant argued that admission of evidence regarding his prior drug-related convictions violated Federal Rules of Evidence 403 and 404(b). Id. at 5. The First Circuit Court of Appeals disagreed, concluding that defense counsel's "cross-examination of government witnesses opened the door to introduction of [the defendant's] prior [drug-related] convictions." Id. at 5. The court found that "defense counsel's questioning raised the specter of [the defendant] having legitimate sources of income, and of not taking part in the delivery of marijuana which 'mysteriously appeared' in a buyer's car." Id. at 5-6. The court explained that, "[i]n the context of drug conspiracy cases, [it has] found prior convictions probative of knowledge and intent where they indicate a prior relationship between conspirators, and where they may be relevant to the defendant's knowledge of the presence of contraband and intent to distribute." Id. at 6 (citations omitted). The court found that, given the defendant's "apparent defense, these issues were squarely-even if only implicitly-placed before the jury," and, therefore, the district court did not err by admitting the defendant's prior convictions. Id.
Similarly, in Rodriguez , the defendants were convicted of conspiring to import marijuana and attempting to import marijuana. Rodriguez , 215 F.3d at 114. On appeal, they argued that the district court improperly admitted "testimony about other drug importation efforts in which one or more of them participated." Id. at 118. At trial, one of the defendants claimed that "he was just a fisherman who liked the waters off St. Thomas and who was innocently caught up with others who, if they intended a crime, had not told him their purpose." Id. at 119. The government introduced "evidence of a second incident in which [that defendant] was involved in a completed drug venture with some of the same participants." Id. The First Circuit Court of Appeals held that the district court did not err by admitting such evidence pursuant to Federal Rule of Evidence 404(b)"as possible proof of 'opportunity, intent, preparation or common plan, knowledge or absence of mistake, accident or other innocent reason' for the defendants' activities." Id. at 120.
In Rodriguez and Pelletier , the court upheld the admission of factually similar prior convictions to show opportunity, intent, preparation or common plan, knowledge or absence of mistake with respect to the crime charged, see Pelletier , 666 F.3d at 5 ; Rodriguez , 215 F.3d at 120, whereas, here, the Manchester homicide evidence-factually distinct from the theft conspiracy-was admitted solely to counter the implication that the defendant was unaware of the specific criminal purpose of the July 11 trip. I do not believe that the evidence of the Manchester homicide is "closely connected by logically significant factors" to the defendant's supposed understanding of the purpose of the July 11 trip as to support a permissible inference that contradicts any impression-misleading or otherwise-created by the defendant's testimony. See Bassett , 139 N.H. at 499, 659 A.2d 891. The record discloses no evidence that the defendant and the other members of the theft conspiracy also conspired to commit homicide. Nonetheless, even if there was evidence of a separate homicide conspiracy, such evidence would not rebut the impression that the defendant did not know the true purpose of the July 11 trip unless there was evidence that *1104 the homicide and the theft by unauthorized taking were part of a common plan or scheme. See Rodriguez , 215 F.3d at 119-20 ; Trempe , 140 N.H. at 99, 663 A.2d 620 ; see also N.H. R. Ev. 404(b). There was no evidence that the two crimes were part of a common plan or scheme. Under these circumstances, which also risked the jury deciding a homicide "trial within a trial," I conclude that the relevance of the homicide evidence is based upon an improper character inference. See N.H. R. Ev. 404(b).
Further, any concern by the State that the defendant misled the jury as to his awareness of the true purpose of the July 11 trip presumably could have been addressed by the State calling another witness who participated in the trip to contradict the defendant's testimony. See Trempe , 140 N.H. at 99, 663 A.2d 620 (holding that trial court erred by allowing evidence of separate, unrelated interview in which the defendant was asked about a simple assault against his niece because, although defendant's testimony created misleading impression that he had not been contacted by any police officers, prosecutor could have dispelled impression in other ways). "Opening the door is one thing. But what comes through it is another. Everything cannot come through the door." Gordon v. United States , 783 A.2d 575, 587 (D.C. 2001) (quotation omitted). As we have stated, the purpose of the doctrine is to prevent prejudice and should not be subverted into a rule for injection of prejudice. Trempe , 140 N.H. at 99, 663 A.2d 620. Here, admission of the Manchester homicide evidence ran directly counter to this purpose. In my view, instead of rebutting the impression created by the defendant's testimony, the evidence served only to introduce prejudice. Because the Manchester homicide evidence did not fairly place in its proper context or specifically contradict any misleading impression created by the defendant as to his knowledge of the true purpose of the prior Hampstead trip, I would hold that the trial court erred by admitting evidence of the defendant's alleged involvement in the subsequent unrelated homicide.
The State contends that, even if the trial court erred, the error was harmless. In order to prove harmless error, the State must establish beyond a reasonable doubt that the erroneously admitted evidence did not affect the verdict. State v. Botelho , 165 N.H. 751, 756, 83 A.3d 814 (2013).
The evaluation of whether this standard has been achieved involves consideration of the [other] evidence presented at trial and of the character of the inadmissible evidence itself. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt.
State v. Vandebogart , 139 N.H. 145, 157-58, 652 A.2d 671 (1994) (quotations and citations omitted).
Here, given the nature of the erroneously admitted evidence, I conclude that the State has failed to establish that its admission did not affect the verdict. I believe that Menendez's testimony regarding the defendant's participation in the homicide "may have tempted the jury to condemn the defendant for uncharged felonies." State v. Carter , 140 N.H. 1, 5, 662 A.2d 289 (1995). It may also have induced the jury to conclude that because the defendant participated in the homicide, he probably participated in the theft by unauthorized taking conspiracy. See id. Moreover, given the "odious and provocative nature" of Menendez's testimony, I do not believe that the trial court's limiting instruction cured the prejudicial effect of the evidence. See id. Thus, I cannot conclude that the *1105 Manchester homicide evidence was "inconsequential in relation to the strength of the State's evidence of guilt." State v. Smith , 141 N.H. 271, 280, 681 A.2d 1215 (1996) (quotation omitted).
Accordingly, although I believe that the evidence apart from the Manchester homicide evidence would be sufficient to support a finding of guilt, I cannot say, beyond a reasonable doubt, that the erroneously admitted evidence did not affect the verdict. See State v. Crosby , 142 N.H. 134, 139, 697 A.2d 1377 (1997) ("In determining whether an error was harmless, we ask not whether the evidence, apart from that erroneously admitted, would support a finding of guilt, but whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict." (quotation omitted)); see also Smith , 141 N.H. at 280, 681 A.2d 1215 (concluding that admission of defendant's prior bad checks convictions was harmless because it did not involve acts of an "odious or provocative nature, such as sexual assault or homicide" (quotation, citation and brackets omitted)). Therefore, I would reverse the defendant's convictions and remand for a new trial.
BASSETT, J., joins in the opinion of CONBOY, J.